494 S.E.2d 120

**In the Matter of R. Eugene MILLER, Respondent.**

**No. 24722.**

Supreme Court of South Carolina.

Submitted Oct. 29, 1997.

Decided Dec. 8, 1997.

Coming B. Gibbs, Jr., Charleston, for respondent.

Attorney General Charles Molony Condon and Senior Assistant Attorney General James G. Bogle, Jr., Columbia, for complainant.

PER CURIAM

In this attorney grievance matter, respondent has admitted the allegations against him and consents to disbarment. We accept his admission and disbar respondent. The admitted allegations involve several different matters, discussed separately below.

*Abundant Life Church Matter*

Abundant Life Church (Church) consolidated three mortgages into one and chose respondent to close the transaction. Respondent received a check for $455,059 which he deposited in his trust account on July 28, 1995. The ending balance in the trust account for July 1995 was $434,642.99 which indicated respondent had misappropriated the Church's funds. During August, two of the Church's mortgages were satisfied with funds from respondent's trust account. Instead of satisfying the third mortgage for $360,309.71, respondent began making monthly payments.

In October, an unrelated third party gave respondent a check for $359,209.93 which respondent deposited in his trust account. Respondent then wrote a check to satisfy the Church's third mortgage. However, the third party's check was not honored by the drawee bank, and therefore the funds in respondent's trust account were insufficient to cover the check. The bank which maintained respondent's trust account honored the check anyway, leaving a negative balance in respondent's trust account of $347,732.61.

Respondent negotiated with the bank to pay the amount owed. During those negotiations, respondent attempted to

dissuade the bank from revealing his misconduct by threatening, "I must caution you, however, that should punitive action be instigated or information leaked to the Bar, ... then my individual efforts to satisfy the bank and to remove the problem as it relates to me will not only become impaired but will become a matter of impossibility."

*Estate of Raymond Fougerousee Matter*

In July of 1993, respondent was asked to represent the estate of Raymond Fougerousee. A check for $244,000, representing the principal amount of the estate, was deposited into respondent's trust account in July. In October, a check for $1,363.56 was also deposited. Mr. Fougerousee's widow instructed respondent to use these proceeds to satisfy two residential mortgages. Instead of following her instructions, respondent made monthly payments on these mortgages from July of 1993 until the fall of 1995. These mortgages remain unsatisfied, and as of August 4, 1997, respondent's trust account had a zero balance.

*John Thomas Parker Matter*

John Thomas Parker gave respondent a check for $28,060.80 in April of 1993 to give to the South Carolina Coastal Council to release an easement. Respondent deposited the check in his trust account and thereafter misappropriated Parker's money.

*Annie Laurie Bendt Matter*

Annie Laurie Bendt is engaged in the business of buying and selling real estate in Charleston. In December of 1994, respondent received $189,995.93 as Bendt's escrow agent. In March of 1995, Bendt gave respondent approximately $23,000 to hold in relation to an option to purchase property. In April of 1995, Bendt gave respondent $142,153.23 which she received after a closing, bringing the total of her funds held by respondent $355,149.16. During the spring of 1995, Bendt received part of her money, thereby reducing the balance of her funds held by respondent to $133,539.83. In October, Bendt needed $83,495.76 to purchase property in Georgia. At that time, respondent did not have sufficient funds in his trust account to give Bendt that sum, but arranged for an artificial balance through a check kiting scheme with a third party. Respon-

dent did not give Bendt the funds she needed until eight days after she requested them.

In December of 1994, Bendt sold a home. On behalf of Bendt, respondent received a check payable to MARCAR Title Insurance Agency.[1] Respondent endorsed the check and deposited it into his trust account. In April of 1995, Bendt sold another home. As part of the transaction, she wrote a check to MARCAR Title Insurance Agency, which respondent also endorsed and deposited into his trust account. Furthermore, MARCAR was reflected as the seller in the April transaction even though respondent had no right to use MARCAR as an intermediary for any transaction.

*Annie Laurie Bendt and Scott Elliott/Florence Medlin Matter*

Bendt purchased property owned by Scott Elliott and Florence Medlin in April of 1995. Respondent served as the closing attorney. Instead of satisfying the prior mortgage held by Elliott and Medlin, respondent made two monthly payments.

*Margaret Schultz Matter*

Margaret Schultz purchased property and hired respondent to represent her. She entrusted respondent with a cashier's check from her home equity line of credit for $175,000 and a check for $5,000 from her personal account. Respondent was to bring this money to the closing. Respondent failed to bring the money, but assured the attorney who conducted the closing he would satisfy the seller's mortgage with the $180,000 in his possession plus approximately $17,397.30 given to him as a result of the closing.

Respondent exchanged the cashier's check for $175,000 for two checks, one for $95,000 payable to respondent and one for $80,000 payable to First Federal Bank. The check to First Federal was used to satisfy the debt of another client.

Respondent used the $17,397.30 check given to him at the closing to purchase one cashier's check payable to himself in the amount of $7,000 and another one payable to himself in the amount of $7,112.98. He also purchased a cashier's check payable to Charleston County Treasurer in the amount of

---

1. Respondent and his former partner, Berry Baker, were MARCAR's officers. Their children were the stockholders.

$3,284.32. The two checks payable to respondent were recovered and turned over to a court-appointed trustee. However, respondent misappropriated the rest of Schultz's money.

*The Stiles Point Matter*

A lot in Stiles Point Plantation was sold in April of 1995. Respondent was the escrow agent for this transaction and received $109,654.11 which he subsequently misappropriated.

*Lewis and Amy White Matter*

During September of 1995, Lewis and Amy White sold property and chose respondent as their escrow agent. He was given $110,463.99 to satisfy an $80,000 mortgage given by First Federal and a loan of $30,000. Respondent paid First Federal, but the money he used came from the Margaret Schultz transaction discussed above. The loan was never paid. Respondent then used the money given to him as a result of the Whites' transaction to open another trust account. At the end of October, the balance in this trust account was $26,-265.23, and at the end of the year, the balance had dipped to $7,298.83.

*Erica Johnson Matter*

Erica Johnson and her two children were injured in a car accident in June of 1993. Johnson retained respondent to represent them. In October of 1994, respondent received three insurance checks for the Johnsons totaling $52,972.36 which he deposited in his trust account. Of this sum, Johnson only received $14,604.66.

*Mary Urie and Livisco Urie Matter*

Mary Urie and her son Livisco were injured in a car accident in November of 1994. As their attorney, respondent settled their case and received insurance checks for $25,000. However, the Uries received only $9,077.19 of that settlement.

*The Estate of Herman Bell Matter*

Respondent represented the estate of Herman Bell. Bell was killed when he was hit by a car. Bell's personal representative brought suit on his behalf, and a settlement was reached. The amount due the personal representative after court costs and attorney's fees were deducted was $15,626.50. The personal representative had agreed to share this amount with a deceased brother. Although the personal representa-

tive received her half, respondent misappropriated the deceased brother's half which amounted to $7,813.25.

*John Bennett Matter*

A Charleston attorney, John Bennett, complained to the Commission on Lawyer Conduct after respondent served as the closing attorney for a Mr. and Mrs. Johnson in June of 1995. Instead of satisfying a prior mortgage, respondent made two monthly payments before making the final payment in August of 1995. In the meantime, respondent misappropriated the Johnsons' funds. To cover a negative balance in his trust account, he then engaged in a check kiting scheme, procuring from a third party a check for $159,750. Respondent used this sum, plus another client's funds, to satisfy the Johnsons' prior mortgage.

*Heyward McDonald Matter*

A Columbia attorney, Heyward McDonald, also complained to the Commission about respondent after respondent served as the closing attorney for a sale of real estate in April of 1995. Respondent was to satisfy a mortgage for the seller, Mrs. Galloway, in the amount of $286,907.62. Instead, he misappropriated these funds and continued to make monthly payments on the mortgage. In July of 1995, respondent used funds belonging to other clients to satisfy this mortgage.

*Jack and Dorothy Jaskwhich Matter*

Jack and Dorothy Jaskwhich sold real estate to Annie L. Bendt in October of 1994. Respondent closed the transaction, but did not satisfy the Jaskwhiches' mortgage. Instead, he converted their funds to his own use and continued to make their monthly payments until November of 1995. At that time, respondent used funds from another source to satisfy their loan.

*Thomas C. and Julia Huffman Matter*

In April of 1994, the Huffmans refinanced a loan and asked respondent to handle the closing. As a result of the closing, respondent received $95,565.50 which was to be used to pay the Huffmans' prior mortgage. Instead of satisfying the mortgage, respondent made three monthly payments and converted the Huffmans's funds to his own use. Respondent

used funds from another source to satisfy this mortgage in June of 1994.

## D.E. Palassis Matter

Respondent represented D.E. Palassis in a closing in July of 1993. As a result of prospective improvements on the land involved, Palassis asked respondent to withhold $18,000 of the proceeds due him. Respondent withheld these funds and converted them to his own use.

## Commingling of Funds

During 1994, respondent received sums of money from third parties which he deposited into his trust account to prevent shortages therein, thereby co-mingling non-client funds with client funds.

## Check Kiting

During 1994 and 1995, respondent solicited the assistance of other persons to engage in check kiting to create artificial balances in his trust account until he could receive client funds to cover these shortages. Records show seven checks totaling $842,709.93 were drawn on four different banks as part of this scheme.

These repeated instances of improper conduct regarding client funds demonstrate a pattern and practice of violating the Rules of Professional Conduct. Rule 407, SCACR. Respondent has failed to act with reasonable diligence and promptness in representing clients. Rule 1.3. He has misappropriated client funds, has failed to promptly deliver to third persons funds they were entitled to receive, and has failed to render a full accounting regarding the property third persons as required by Rule 1.15. He has engaged in reprehensible conduct involving dishonesty, fraud, deceit and misrepresentation. Rule 8.4(d). He has engaged in conduct prejudicial to the administration of justice. Rule 8.4(e). His conduct has brought the legal profession into disrepute and has demonstrated his unfitness to practice law. This conduct warrants disbarment.

Accordingly, we disbar respondent from the practice of law. Respondent has requested his disbarment be retroactive to the date of his interim suspension. This request is denied. Within fifteen days of the date of this opinion, respondent

shall file an affidavit with the Clerk of Court showing he has complied with Rule 30 of the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR. In addition to all other requirements respondent must meet to be reinstated under Rule 413, SCACR, no petition for reinstatement shall be accepted until respondent has filed proof he has made full restitution to all institutions and individuals who have lost money as a result of his fraudulent acts or mishandling of trust funds, to include restitution to the Lawyer's Fund for Client Protection for any payment it may make.

DISBARRED.